RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0047p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

REBECCA COOPER, MORRIS MCKENNEY, and ROBERT KOLINSKE, for themselves and others similarly-situated,

　　　　　　　*Plaintiffs-Appellees*,

　　　*v.*

HONEYWELL INTERNATIONAL, INC.,

　　　　　　　*Defendant-Appellant*.

┐
│
│
│
├　No. 17-1042
│
│
│
┘

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cv-00471—Janet T. Neff, District Judge.

Argued: August 3, 2017

Decided and Filed: March 8, 2018

Before: SUTTON, McKEAGUE, THAPAR, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Cody D. Rockey, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellant. John G. Adam, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees. **ON BRIEF:** Cody D. Rockey, Jill M. Wheaton, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, Mark J. Magyar, DYKEMA GOSSETT PLLC, Grand Rapids, Michigan, for Appellant. John G. Adam, Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, William Wertheimer, LAW OFFICE OF WILLIAM WERTHEIMER, Bingham Farms, Michigan, for Appellees.

---

**OPINION**

---

McKEAGUE, Circuit Judge.  This is yet another entry in a complicated tangle of cases dealing with whether retiree benefits in a collective bargaining agreement ("CBA") should extend beyond the CBA's expiration.  Rebecca Cooper and some 50 other retirees at Honeywell International's Boyne City, Michigan plant say that Honeywell must provide them healthcare benefits until they reach age 65.  Honeywell responds that its obligation to pay those benefits ended when its CBA with the Boyne City employees expired in March 2016.

While waiting for the district court to pick the winner in this fight, the retirees sought a preliminary injunction barring Honeywell from terminating their healthcare.  The district court granted the injunction, concluding that the retirees had shown both a likelihood of success on the merits and that they would suffer irreparable harm without such relief.  Because we find that the retiree healthcare benefit provision in the CBA did not clearly provide an alternative end date to the CBA's general durational clause, we conclude that Cooper has not shown a likelihood of success on the merits and thus **REVERSE** the decision of the district court.

**I**

Named plaintiffs Rebecca Cooper, Morris McKenney, and Robert Kolinske (collectively, "Cooper") are all former employees at Honeywell International, Inc.'s Boyne City, Michigan auto parts plant.  While working at the plant, they were members of the collective bargaining unit represented by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW").  This case concerns the CBA between the Boyne City UAW bargaining unit and Honeywell that became effective May 17, 2011 and remained in effect until March 30, 2016.

The focus of the parties' dispute is Article 19.7.4, the provision covering retiree healthcare[1]:

19.7.4   Retirees under age 65 who are covered under the BC/BS Preferred Medical Plan will continue to be covered under the Plan, until age 65, by payment of 16% of the retiree monthly premium costs which is currently, as of May 17, 2011, $113.64 per month for single and $275.52 per month for family, as adjusted year to year.

About 27 "under age 65" Boyne City employees—Cooper, McKenney, and Kolinske among them—took early retirement under the 2011 CBA and began receiving Honeywell-sponsored healthcare, consistent with the terms of Article 19.7.4.  Other Boyne City employees had retired before the 2011 CBA took effect, but were still eligible for the retiree benefits provided for in Article 19.7.4.

On November 9, 2015, Honeywell notified the UAW and the Boyne City retirees that it planned to terminate retiree medical benefits upon the 2011 CBA's March 30, 2016 expiration.[2]  In December, Honeywell decided to delay the termination of benefits until the end of 2016.

Five months later, on May 6, 2016, Cooper filed a class-action suit against Honeywell.  Suing on behalf of roughly 50 other retirees and their dependents, Cooper, McKenney, and Kolinske alleged Honeywell was obligated to continue providing benefits to retirees until they reached age 65.  They identified a right to relief under the Labor Management Relations Act (LMRA), the Employment Retirement Income Security Act (ERISA), and Michigan common law estoppel.  Plaintiffs also asked the court to compel Honeywell to arbitrate these claims, but the district court demurred.

Then, in November 2016, little more than a month before retiree healthcare benefits were set to expire, Cooper moved for a preliminary injunction enjoining Honeywell from terminating

---

[1]Other provisions of the CBA are also relevant to the parties' competing interpretations of the effect of Article 19.7.4, but those are set forth in the analysis of the arguments.

[2]It is interesting to note that, while McKenney and Kolinske retired before this notice of termination was sent, Cooper retired on February 29, 2016—well after Honeywell had made clear that retiree healthcare would not be provided after the end of 2016.

the benefits. In a brief two-page order, the district court granted Cooper's preliminary injunction, relying on its reasoning at oral argument.

This appeal followed.

## II

Critical to this appeal is the district court's conclusion that Cooper established a likelihood of success on the ultimate contract dispute. Cooper argued that Article 19.7.4's "until age 65" language had a vesting effect, meaning those who retired before the 2011 CBA expired were entitled to healthcare benefits until they reached age 65—even if the 2011 CBA expired in the interim. Honeywell said that the "until age 65" language does not vest healthcare benefits beyond the CBA's end date, but rather only explains who is eligible for benefits during the CBA's operation. The district court was torn. Noting that the "law in this area is in something of a state of flux" and that "there's not a slam dunk on either side," it nevertheless concluded that Cooper did enough to establish a likelihood of success on the merits and granted the injunction.

On appeal, the parties hold to their positions and renew the same arguments they urged before the district court. Aided by recent cases clarifying the law in this area, our review of those arguments leads us to a different conclusion: Cooper cannot show a likelihood of success on the merits. Failing to do so, the district court necessarily erred in granting Cooper's preliminary injunction.

### A.    Standard of Review

District courts consider four factors in deciding whether to issue a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Entm't Prods., Inc. v. Shelby Cty., Tenn.*, 588 F.3d 372, 377 (6th Cir. 2009). But a "preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir.

2010) (quoting *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)). Because Cooper's argument falters on this first factor, our inquiry goes no further.

And while we normally review a district court's weighing of the four preliminary injunction factors for an abuse of discretion, the "preliminary question of whether a movant is likely to succeed on the merits" is a question of law we review de novo. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Likewise, the critical merits issue here turns on the meaning of a contract's terms, another purely legal question reviewed de novo. *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 466 (6th Cir. 2009). Because our analysis of the district court's preliminary injunction decision starts and stops with the likelihood-of-success question, we owe the district court no deference.

B.    Analysis

1.    Key Case Law on CBAs and Benefit Vesting

Governed as we are by precedent, we cannot very well talk about this case without talking about the many, ever-so-slightly different ones before it. The sensible place to start is with the Supreme Court's decision in *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015). In *Tackett*, the Supreme Court abrogated the so-called *Yard-Man* inference that this Circuit had often invoked to place "a thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements." *Id.* at 935. It is hard to overstate how powerful this inference was, especially in benefits vesting cases. For instance, applying the *Yard-Man* inference had led us in the past to read a CBA's "general-durational clause—the clause that typically says when the contract goes into and out of effect— to 'say[] nothing about the vesting of retiree benefits' unless the contract contained specific durational language that referred to retiree benefits." *Watkins v. Honeywell Int'l Inc.*, 875 F.3d 321, 324 (6th Cir. 2017) (quoting *Noe v. PolyOne Corp.*, 520 F.3d 548, 555 (6th Cir. 2008)).

*Tackett* discarded *Yard-Man* and ordered the Sixth Circuit "to apply ordinary principles of contract law in the first instance." 135 S. Ct. at 937. Furthermore, and relevant to this case, *Tackett* said that a general durational clause *can* be read to prevent vesting; a contract need not include a specific end-date for each type of benefits. *Id.* at 936. It also concluded that our court

"failed even to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises." *Id.* On remand, the Sixth Circuit identified several principles of contract law that it instructed the district court to apply. *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 210 (6th Cir. 2016) (*Tackett III*). One principle particularly relevant here: while courts cannot require a specific durational clause for each benefit to prevent vesting, courts also cannot presume "that a general durational clause says *everything* about the intent to vest." *Id.* at 209.

*Gallo* came next. In *Gallo*, we held that a CBA's general durational clause foreclosed the retirees' vesting argument. We emphasized that "[w]hen a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination." *Gallo v. Moen Inc.*, 813 F.3d 265, 269 (6th Cir. 2016). Said another way: "Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" *Id.* "Consistent with traditional contract interpretation principles and with prior precedents of the Supreme Court, 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *Id.* at 269-70 (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991)). And because the *Gallo* CBA did not specify an alternative end date for healthcare benefits, the CBA's general durational clause controlled.

Then came a trifecta of cases published on the exact same day: April 20, 2017. In one, *Cole v. Meritor*, 855 F.3d 695, 699 (6th Cir. 2017), we relied on *Gallo* in holding that retiree healthcare benefits did not vest for life because the general durational clause controlled. But in the two other cases, *Kelsey-Hayes* and *Reese*, the court came to the opposite conclusion. The majority in both cases applied the *Tacket III* general-durational-clause-doesn't-say-everything-about-vesting principle over a dissent which *would have* held, like *Gallo*, that the general durational clauses defeated the retirees' vesting arguments. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW) v. Kelsey-Hayes Co.*, 854 F.3d 862, 871 (6th Cir. 2017); *Reese v. CNH Indus. N.V.*, 854 F.3d 877, 882 (6th Cir. 2017). In *Kelsey-Hayes*, certain healthcare benefits were time-limited while others were not, so when the CBA used language suggesting benefits "continued," we said it was unclear until when. 854 F.3d at 867. In *Reese*,

meanwhile, we said the CBA's general durational clause didn't control since the CBA did not "clearly state[] that the general-durational clause was intended to govern healthcare benefits," 854 F.3d at 883, and the parties had "carved out certain benefits . . . and stated those coverages ceased at a time different than other provisions of the CBA," *id.* at 882. As such, we held that both CBAs were sufficiently ambiguous to require consideration of extrinsic evidence, which in both cases supported the retirees' vesting claims.

### 2.       Clarity Emerges from Three Post-Argument Cases

But as the district court presciently forewarned in issuing its preliminary injunction ruling, "the developing law" in this area "may change," especially given the "numerous cases currently before the Sixth Circuit on issues surrounding this." And indeed, after the district court's decision and after oral argument before us, three decisions—two from the Supreme Court, and one from this court—strongly suggest this case is one of the *usual* ones, i.e., that the general durational clause in the 2011 CBA provides an end date to Honeywell's provision of retiree healthcare.

Most importantly, on February 20, 2018, the Supreme Court summarily reversed our decision in *Reese*. *CNH Industrial N.V., v. Reese*, 583 U.S. ___ (2018), slip op. at 1. In its *per curiam* opinion, the Court explained that our decision had improperly relied on defunct *Yard-Man* inferences in a variety of ways: by refusing to give effect to the general durational clause, by reading the CBA's silence on a retiree healthcare end date as evidence of an intent to vest benefits, and by tying retiree benefits to pensioner status. *Id.* at 4-7. The Court made clear that *Tackett* bans the use of *Yard-Man*-style inferences not only in *finding benefits have vested*, but also in *determining whether the CBA is ambiguous as to vesting*, such that extrinsic evidence can then be considered to determine whether benefits have vested. *Id.* at 7. "*Tackett* . . . rejected these inferences not because of the *consequences* that the Sixth Circuit attached to them . . . but because they are not a valid way to read a contract. They cannot be used to create a reasonable interpretation any more than they can be used to create a presumptive one." *Id.* Finally, and critically, the Court reminded us that a general durational clause should be "applied to all benefits, unless the agreement specified otherwise." *Id.* at 8. The Court thus reaffirmed the rule

we enunciated in *Gallo*: absent a specific indication otherwise, the "general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" 813 F.3d at 269.

Then, only six days later, the Court summarily vacated our decision in *Kelsey-Hayes* and remanded "for further consideration in light of" its just-released opinion in *Reese*. *Kelsey-Hayes Co. v. Int'l Union*, 583 U.S. ___ (2018). Suddenly, the intra-circuit split that existed as to whether general durational clauses controlled the expiration of retiree benefits appears ready to be sealed shut. The Supreme Court's reversal in *Reese* and remand in *Kelsey-Hayes* are powerful indications that general durational clauses should dictate when benefits expire, unless an alternative end date is provided.

At the same time, those decisions do not quite close the door on Cooper's case.[3] As is so often true in this area of law, there are subtle yet important differences between the CBAs at issue and between the different legal theories urged by the parties. In both *Reese* and *Kelsey-Hayes*, for example, the retirees argued that benefits had vested for life, not just until age 65. And the retirees in those cases seized on different facets of the CBA—silence in *Reese*, the presence of varying expiration dates for certain benefits in *Kelsey-Hayes*—to establish ambiguity. Here, by contrast, the retirees say the "until age 65" language not only shows an intent to vest benefits, but does so only until age 65, not for life.

That brings us to a recent decision of this court that, when read in light of *Reese* and *Kelsey-Hayes*, proves all but fatal to Cooper's case.[4] In *Serafino v. City of Hamtramck*, 707 F.

---

[3]And interestingly, Cooper was first to direct our attention to the Supreme Court's reversal in *Reese* through a Fed. R. App. P. 28(j) letter. Because the Court quibbled with our reliance on silence, but the Boyne City 2011 CBA uses the phrase "until age 65," Cooper says *Reese* actually supports her argument. We disagree, though we applaud Cooper's counsel for so willingly engaging with *Reese*. The principal takeaways from *Reese* are that *Yard-Man* must be put to bed for good, and that general durational clauses—as we held in *Gallo*—must be honored save a clear indication to the contrary. For the reasons we explain later in this opinion, the "until age 65" language is not such a clear indication.

[4]Honeywell directed the panel to *Serafino* in a Fed. R. App. P. 28(j) letter. *See* Dkt. 32.

App'x 345, 347 (6th Cir. 2017),[5] we considered a retiree healthcare provision relevantly similar to the 2011 Boyne City CBA at issue here. The *Serafino* CBA stated in pertinent part:

> **The City shall pay in full for the cost of medical, hospital, and surgical insurance** (as more fully described in Section 7(a) [the provision for active employee healthcare insurance]) for employees and eligible members of employees' families who retire on or after July 1, 1986 **until that retired employee attains the age of sixty-five (65)** or is eligible for [M]edicare or [M]edicaid.

*Id.* (emphasis added). The CBA in this case, meanwhile, reads:

> 19.7.4    Retirees under age 65 who are covered under the BC/BS Preferred Medical Plan **will continue to be covered under the Plan, until age 65**, by payment of 16% of the retiree monthly premium costs which is currently, as of May 17, 2011, $113.64 per month for single and $275.52 per month for family, as adjusted year to year.

2011 CBA (emphasis added). Serafino argued that the phrase "until that retired employee attains the age of sixty-five" evinced an intent to vest benefits for life. *Serafino*, 707 F. App'x at 354. Why was that? Because, Serafino reasoned, the provision "does not read 'until they reach age 65 or are eligible for Medicare or Medicaid *OR UNTIL THE EXPIRATION OF THIS AGREEMENT WHICHEVER IS SOONER.*'" *Id.* (quoting Serafino's brief). "But," we responded, "that is exactly how it reads because unless there is 'a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'" *Id.* (quoting *Gallo*, 813 F.3d at 269). *Serafino* predated the Supreme Court's decision in *Reese* and was unpublished, but *Reese* confirms its reasoning was correct.

Yet here again, Cooper's case is not exactly on all fours with *Serafino*. For one thing, Serafino claimed the "until age 65" vested benefits for life; Cooper says the "until age 65" phrase in this CBA only vests benefits until that age. But we cannot make much of that distinction. After all, *Serafino* did not suggest the retirees' argument would have had any more traction if Serafino argued they were entitled to benefits only until age 65. To the contrary, the opinion held flatly that the "until age 65" language does not create an alternative end-date to the general

---

[5]Though *Serafino* is unpublished, we find its reasoning persuasive—especially given the Supreme Court's reminder in *Reese* that general durational clauses control absent specific indications to the contrary—and adopt it here.

durational clause. It seems instead that *Serafino* found the CBA's promise to continue paying retiree healthcare benefits until a certain age served only to "*guarantee*[] benefits until the agreement expires, nothing more." 707 F. App'x at 352 (quoting *Gallo*, 813 F.3d at 269). *Serafino* thus deals a serious blow to Cooper's theory that Article 19.7.4's promise to provide healthcare benefits "until age 65" functions as an alternative end date to that provided in the general durational clause.

### 3. Additional Reasons the 2011 CBA Unambiguously Did Not Vest Retiree Healthcare Benefits

Still, we acknowledge the factual discrepancies between this case and every other one in this Circuit that has rejected retiree benefit-vesting arguments. To the extent those distinctions leave the door cracked for Cooper's theory, a bevy of other considerations slam it shut.

Stick first with the text of Article 19.7.4. Cooper insists that the CBA's promise that Honeywell will provide healthcare benefits "until age 65" is the sort of "specific" and ascertainable "end date" that *Gallo* requires to supersede the general durational clause. Appellees' Br. at 21 (quoting *Gallo*, 813 F.3d at 269). But a promise to continue providing benefits in a CBA—whether that promise is left open-ended, or whether, as here, it has a specific terminus—does not by itself vest those benefits in retirees beyond the CBA's expiration. All it does is (1) provide a guarantee of those benefits while the CBA is in effect and (2) provide for the expiration of those benefits even before the CBA itself expires. Consider a hypothetical 64-year-old Boyne City retiree right after the 2011 CBA went into effect. If the CBA did not include the "under age 65" limitation on retiree healthcare coverage, that retiree would continue to be covered until the CBA expired, at which point the retiree could be 69 years old. To prevent retirees from being covered beyond the collectively-bargained-for age, the "under age 65" limitation had to be included in Article 19.7.4. That language also protects retirees by ensuring Honeywell cannot prematurely terminate benefits for eligible, under-age-65 retirees. This is all to emphasize what this court has already made clear: when a CBA provision promises to

"continue" providing benefits, we can assume only it "*guarantee*[*s*] benefits until the agreement expires, nothing more." *Gallo*, 813 F.3d at 269.[6]

To be sure, there is no hard-and-fast rule that a provision cannot delineate eligibility for retiree benefits during the CBA's operation and *also* serve to vest benefits beyond the CBA's duration. But to do so, either the provision must say something more—for example, "retirees will continue to be covered under the plan until age 65, *regardless whether this CBA expires before they reach that age*"—or other clues must spring from the CBA supporting that intent. What other clues there are here, however, only reinforce Honeywell's reading of Article 19.7.4.

Perhaps the most powerful of these clues is the provision's choice of the words "will continue to be covered." That language guarantees that Boyne City employees who retired *before* the 2011 CBA will continue to receive healthcare coverage under the terms of the new CBA. The CBA immediately preceding the 2011 one used identical "will continue to be covered" (and "until age 65") language. But if a promise that retirees will continue to be covered until age 65 vested those benefits—notwithstanding a CBA's intervening expiration—then why would each successive CBA need to repeat the same promise? We made this exact point in *Gallo*. 813 F.3d at 270-71 ("There would be no need to 'continue' such benefits if prior CBAs had created vested rights to such benefits."). And we echoed it in *Serafino*:

> But, since each successive FOP CBA has contained substantially similar language regarding retiree healthcare, that raises the question: if anyone—the FOP, the retirees, or the City—believed that the retirees' rights had vested, why would their healthcare benefits be included in a 2007 CBA? The only reasonable inference, of course, is that the parties did not believe this language created a vested right to lifetime healthcare benefits and thus had to include it in each new CBA.

707 F. App'x at 353. Finally, it is also significant that the 2011 CBA does *not* use similar "continuing" language when referencing pension benefits that everyone agrees did vest under old

---

[6]It is further telling that the only Sixth Circuit case cited by Cooper to suggest the "until age 65" phrase displaces the general durational clause's end-date does not stand for the proposition Cooper says it does. Appellees' Br. at 22 (citing *Linville v. Teamsters Local 284*, 206 F.3d 648, 651 (6th Cir. 2000). *Linville*, in fact, only made clear that even the once-vaunted *Yard-Man* inferences could not be used to turn time-limited benefits into lifetime ones. In any event, *Serafino* is the most on-point case we have—dealing as it does with an "until age 65" provision—and we did not find there that such a provision showed an intent to vest benefits beyond the CBA's expiration.

CBAs, a further indication that the 2011 CBA did not intend to vest retiree healthcare benefits. *Gallo*, 813 F.3d at 270.

Our conclusion that Article 19.7.4 did not vest benefits is confirmed by reference to the 2011 CBA's other provisions and documents it incorporates. Particularly relevant here is Article 20.2.4, which makes reference to a "deferred vested pension under the pension plan." That the CBA explicitly describes one type of benefit as "vested" but does not do the same for retiree healthcare benefits is telling. *See Gallo*, 813 F.3d at 270 ("The difference in language demands a difference in meaning."). That is especially true given that retiree benefits, in contrast to pension benefits, do not vest as a matter of law. *See* 29 U.S.C. § 1053(a). "Thus, if the parties here intended healthcare benefits to vest on retirement, they would have taken care to include express vesting language, as they did for pension benefits, to ensure that healthcare benefits would vest on retirement." *Watkins v. Honeywell Int'l, Inc.*, No. 3:16CV01925, 2016 WL 7325161, at *6 (N.D. Ohio Dec. 16, 2016), *aff'd*, 875 F.3d 321 (6th Cir. 2017). But the parties did not, despite the CBA's reference to vested benefits in another context. This is not to suggest, of course, that the *only* way to know if a benefit is vested is whether the benefit is referred to elsewhere in the CBA as a "vested [benefit]." All we mean to say is that it is significant when a CBA uses "vested" in one place and yet omits the word in the provision at the center of the vesting dispute.

The retiree medical plan itself provides a final indication that the CBA did not intend to vest retiree healthcare benefits. The CBA, in Article 19.7.4, refers to the plan as a source of determining who is covered: "Retirees under age 65 who are covered under the BC/BS Preferred Medical Plan will continue to be covered under the Plan . . . ." As such, the CBA incorporates the medical plan, and we can consider its content without running afoul of the parol evidence rule. *See Int'l Ass'n of Machinists & Aerospace Workers v. ISP Chemicals, Inc.*, 261 F. App'x 841, 848 (6th Cir. 2008) (considering external benefits book because CBA "clearly and unequivocally identifies the benefits book as the location where the details of the employee contribution rate structure for the medical benefits provided by the CBA may be found"). The plan states that coverage "will cease on the date Honeywell terminates the Plan." The plan also contains a reservation-of-rights clause that gives Honeywell the "right to terminate the Plan, or

any portion of the plan, at any time and for any reason." Both of these provisions are manifestly inconsistent with vesting; by definition, vested benefits may not be unilaterally terminated.

Cooper contends that the medical plan should not bear on our interpretation of Article 19.7.4 since the plan itself says the CBA controls if there is "any inconsistency or conflict" between the two. But the reservation-of-rights clause can and should be read consistently with the CBA. *See Gallo*, 813 F.3d at 270. That is easy enough on Honeywell's CBA interpretation: Honeywell retains the right to terminate retiree healthcare benefits, but only after the expiration of the 2011 CBA. But Cooper's reading would nullify the plan's reservation-of-rights clause entirely, since Honeywell cannot terminate benefits that have vested.

### 4.    Cooper's Counterarguments Fail to Establish Ambiguity as to Vesting

Cooper, for her part, hardly responds to these textual and structural arguments. She instead looks beyond the four corners of the CBA to Honeywell's "word and deed" to buttress her likelihood-of-success argument. Appellees' Br. at 27. This does her no good. Under "ordinary principles of contract law," *Tackett*, 135 S. Ct. at 933, we look first to the contract itself to determine the contours of the parties' agreement. And "[w]hen the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." *Id.* at 938 (Ginsburg, J., concurring) (citing 11 Williston § 30:6, at 98-104).

The "four-corners" arguments that Cooper does make are in any event unavailing. For starters, Cooper complains that Honeywell's interpretation of the contract "read[s] . . . unbargained expiration-limitation words into" the 2011 CBA. Appellees' Br. at 39. Cooper is correct in a narrow sense. Honeywell's interpretation *does* read words into Article 19.7.4 when it says the provision means "until age 65 *or the CBA expires, whichever occurs first*." But the "or" phrase was not unbargained-for; the words come from the CBA's general durational clause in Article 24.1. And importing the general durational clause's end date into every provision of the CBA is exactly what the Supreme Court told us to do when it reversed us in *Tackett*, 135 S. Ct. at 937 ("[C]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement"); with what this court said in *Gallo*, 813 F.3d at 269

("[T]he general durational clause supplies a final phrase to every term in the CBA: 'until this agreement ends.'"); and with what the Supreme Court said when it reversed us again in *Reese*, slip. op. at 8 (general durational clause provides end date to benefits unless provision "specified otherwise"). Honeywell thus properly interprets the retiree healthcare benefit provision to include an expiration, and we do not err by doing the same.

Cooper next asserts that the CBA's "last-date" warning in Article 19.7.5—notifying employees they must retire before the CBA expires to be eligible for the retiree benefits promised therein—show that the CBA intended to vest retiree benefits. But we cannot see why a "last-date" provision would vest benefits beyond the CBA's duration, rather than serve to inform potential retirees of when they must retire to secure benefits in the first place. In other words, Article 19.7.5 says nothing about how long retiree benefits will last; it speaks only to the timing of eligibility to receive retiree benefits at all. Of course, we recognize the hardship our decision today may work on some Boyne City retirees. Those who assumed their healthcare benefits would vest upon retirement and retired shortly before the CBA's expiration to access those benefits would have given up part of their pensions for nothing. It appears one named plaintiff, McKenney, did just that; he retired in November 2015 at age 60, taking a reduced pension in the hope of securing longer-term healthcare benefits.[7] Under our interpretation here, however, McKenney lost entitlement to those benefits when the CBA expired just five months later.[8] While the tough implications of our decision for some retirees are not lost on us, that parties misread a contract is no license for a court to do the same.

Finally, Cooper makes two arguments relating to the CBA's contribution caps, neither of which help her vesting argument. First, Cooper identifies evidence of vesting in Article 19.7.6.1's requirement that Honeywell's contribution caps be discussed in any future CBA bargaining. If, Cooper reasons, the 2011 CBA made contribution *caps* a mandatory subject of bargaining going forward, then the 2011 CBA reflected agreement that retiree healthcare *benefits*

---

[7]Cooper also retired right before the CBA expired, but she did so after given clear notice that Honeywell intended to terminate retiree healthcare benefits at year's end.

[8]Though, in truth, McKenney's benefits did not expire until some two years *after* the CBA's expiration because of the district court's injunction.

would outlast the CBA's expiration. Without vesting, Cooper suggests this "mandatory subject" provision would be superfluous. We disagree. As Honeywell puts it: "There is nothing superfluous about an agreement to negotiate even if there was no preexisting contractual obligation to continue providing the benefits." This is a familiar principle even to us in the courts. We tell every criminal defendant that if he loses at trial, he may appeal by right. That he is afforded this future *procedural* right presupposes no extant *substantive* right to a remedy. Article 19.7.6.1 works the same. It tells the parties they must discuss future retiree healthcare benefits—including contribution caps—but says nothing about whether the 2011 CBA vested benefits (or even whether Honeywell will continue to provide retiree benefits at all).

Second, Cooper argues that the contribution caps themselves show an intent to vest retiree healthcare benefits. Cooper emphasizes three things about the caps: (1) that they were negotiated and agreed on during the bargaining for the 2008-2011 CBA; (2) that the caps applied only to those who retired after June 2009; and (3) that the caps did not go into effect until 2012, during the operation of the 2011 CBA. Cooper says the fact that these caps only applied in the future—after the 2008-2011 CBA expired and after the 2011-2016 CBA took effect—shows retirees were vested with healthcare until age 65, despite the intervening CBA change.

Cooper is mistaken. Contribution caps function only as limiting provisions protecting *Honeywell's* exposure in the event healthcare benefits continue to be provided; they do not speak to the scope of *retirees'* rights. And though the caps take effect down the road, they serve an immediate purpose. "There is a good reason for a company to adopt healthcare caps, even if caps take effect only far in the future: because companies must recognize as a liability on their balance sheet the present value of their anticipated future healthcare costs, caps keep companies from needing to recognize millions (or more) in future potential liability." *Watkins*, 875 F.3d at 327. Moreover, like Honeywell says, the future-effect nature of the caps is an unsurprising product of collective bargaining. That the caps only apply to post-June 2009 retirees, and only take effect after 2012, might well mean that Honeywell could only secure a contribution cap by offering to delay its implementation. It is also unclear that the parties intended the cap to apply beyond the 2008-negotiated CBA, since at the time the cap was negotiated, the 2008 CBA could have continued in effect indefinitely. As Article 20.1 provides, the 2008 CBA "shall continue in

effect from year to year . . . unless either party notifies the other." To nevertheless infer an intent to vest from the cap's future effect is possible only by invoking *Yard-Man*'s illicit inferences, and indeed Cooper relies on a *Yard-Man* case to suggest future caps indicate vesting. Appellees' Br. at 26 (citing *Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850, 870 (E.D. Mich. 2005)). Finally, even if we found in the caps some oblique evidence of an intent to vest benefits, that would not be enough to overcome the overwhelming indications to the contrary.

### III

Because we do not find in the 2011 CBA an intent to vest retiree healthcare benefits beyond the CBA's expiration, we hold that Cooper is unlikely to succeed on the merits. Unable to make this foundational showing, we therefore must reverse the district court's decision to grant Cooper a preliminary injunction.