**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0079n.06

**Nos. 17-3851/3860**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOSEPH ZINO, et al., | ) | **FILED** |
| | ) | Feb 15, 2019 |
| Plaintiffs-Appellees, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| WHIRLPOOL CORP., et al., | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: SILER, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, J., delivered the opinion of the court in which SILER, J., concurred. STRANCH, J. (pp. 5–13), delivered a separate dissenting opinion.

GRIFFIN, Circuit Judge.

In this class action by Hoover Company retirees, the district court ruled that numerous collective-bargaining agreements vest plaintiffs with unalterable lifetime healthcare benefits. Because we find that the CBAs' general durational clauses (which say when the agreements end) control when healthcare benefits end, we reverse.

I.

Plaintiffs built vacuum cleaners for the Hoover Company at its plant in Canton, Ohio, and retired between 1980 and 2007. Over the years, a succession of CBAs governed employment terms and aspects of retirement, including healthcare benefits. As to those benefits, the agreements contained one of three promises:

- The Company "assumes responsibility for paying premiums . . . for future retiree's [*sic*] medical insurance in accordance with the terms and conditions of the [Welfare Benefit] Plan";
- An eligible "employee who retires . . . shall have the opportunity to continue elements of the medical insurance in accordance with [specified] principles"; and
- "[A]vailable medical benefits" for eligible retirees "shall be" for "pre-65 coverage only" with "no change in current coverage" except for increased cost sharing.

A series of acquisitions left Whirlpool responsible for providing healthcare benefits to plaintiffs. After the company announced drastic reductions to those benefits, plaintiffs sued the company and its Group Benefits Plan under the Labor Management Relations Act and the Employee Retirement Income Security Act, seeking a ruling that the CBAs vest retiree healthcare benefits at unalterable levels.

The parties litigated amidst an earthquake in our case law in which the Supreme Court upended our approach to interpreting the relationship between a CBA's general durational clause and the vesting or non-vesting of healthcare benefits. *See M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 930 (2015) (overruling *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983)). After both phases of a bifurcated bench trial, but before our case law ceased its transformation, the district court ruled that the CBAs vest retiree healthcare benefits at unalterable levels to all plaintiffs.

## II.

Defendants now appeal the district court's judgment in plaintiffs' favor. We review the district court's findings of fact for clear error and its conclusions of law de novo. *Little Caesar v. OPPCO*, 219 F.3d 547, 550 (6th Cir. 2000).

To succeed below, plaintiffs needed to prove that defendants violated a union contract that vests lifetime healthcare benefits. *See* 29 U.S.C. § 185 (providing a cause of action for violations

of a contract between an employer and a union), §§ 1002, 1132 (providing a cause of action to enforce rights under the terms of an employee welfare-benefit plan). Thus we must determine whether the CBAs in this case vest plaintiffs with such benefits. We look first to what each contract says; if its plain language lacks ambiguity, we stop there. *See Fletcher v. Honeywell Int'l, Inc.*, 892 F.3d 217, 228 (6th Cir. 2018).

We've previously recounted the many twists and turns our case law has taken in the past few years, *see Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 616–18 (6th Cir. 2018), but we need not re-map the journey because we recently distilled a rule that dictates the outcome of this case. In *Fletcher*, we held that "a CBA's general durational clause applies to healthcare benefits unless [the CBA] contains clear, affirmative language indicating the contrary." 892 F.3d at 223.

Here, none of the CBAs contain such language; they state that the company will pay insurance premiums "in accordance with the terms and conditions of the [Welfare Benefit] Plan," that retirees "shall have the opportunity to continue" healthcare coverage, or that coverage for retirees "shall be" for "pre-65 coverage only." None of these statements says clearly and affirmatively that the relevant general durational clause doesn't control the termination of healthcare benefits—whether by reference to the general durational clause itself or by other language stating explicitly that healthcare benefits continue past the relevant agreement's expiration. And nowhere else in any of the CBAs does such language appear. This means the general durational clauses control the termination of Whirlpool's obligation to provide healthcare benefits to plaintiffs, which means the obligation ended when the last CBA expired.

At argument, counsel for plaintiffs contended that *Fletcher* doesn't control because no case to date has required a CBA to contain clear vesting language in order to vest benefits. But vesting language differs from language disconnecting specific benefits from a general durational clause,

and *Fletcher* requires the latter, not the former. Put differently, *Fletcher* outlines a threshold requirement: either a CBA says clearly and affirmatively—that is, unambiguously—that its general durational clause doesn't control the termination of healthcare benefits, or the clause controls.

And this threshold requirement is just that: a threshold. If a CBA *does* unambiguously disconnect certain benefits from the agreement's general durational clause, the agreement might well vest those benefits—even absent clear vesting language. Or ambiguity as to vesting might exist. To make the call, a court would need to examine any "clues" that "spring from the CBA." *See Cooper*, 884 F.3d at 620. Although plaintiffs point to a number of clues they say show that the parties intended to vest healthcare benefits, those clues carry no clout here because no CBA unambiguously disconnects healthcare benefits from the governing general durational clauses. And that means the CBAs unambiguously do not vest lifetime healthcare benefits, which ends our inquiry. *Fletcher*, 892 F.3d at 224.

## III.

For these reasons, we reverse the district court's ruling that the CBAs vest retiree healthcare benefits at unalterable levels to all plaintiffs, vacate the district court's judgment, and remand for proceedings consistent with this opinion.

**JANE B. STRANCH, Circuit Judge, dissenting.** I respectfully dissent from our recent line of cases denying lifetime healthcare benefits that employers clearly intended—and promised—to provide. I acknowledge that the Supreme Court corrected our *Yard-Man* case and its progeny, telling us to interpret collective bargaining agreements (CBAs) "according to ordinary principles of contract law." *M&G Polymers USA, LLC v. Tackett* (*Tackett II*), 135 S. Ct. 926, 933 (2015). But in doing so, the Court instructed that "[i]n this endeavor, as with any other contract, the parties' intentions control." *Id*. (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp*., 559 U.S. 662, 682 (2010)).

The goal of contract interpretation is to give effect to the parties' intentions. We are failing that test. The district court decision that we reversed in *Cole v. Meritor, Inc.*, 855 F.3d 695 (6th Cir. 2017), found that the employer repeatedly sent letters to employees that either "expressly use[d] the word 'lifetime'" or "use[d] the words 'life,' 'will continue' and 'for life.'" *Cole v. ArvinMeritor, Inc.*, 515 F. Supp. 2d 791, 806 (E.D. Mich. 2006). Decades of benefits booklets and plan summaries issued under numerous CBAs "promise[d] that company-paid retiree health benefits [were] 'for life.'" *Id.* The district court decision that we reversed in *Fletcher v. Honeywell International, Inc.*, 892 F.3d 217 (6th Cir. 2018), found that during collective bargaining a union negotiator "specifically stated that the Greenville retirees already had lifetime healthcare benefits," and "none of the [company] negotiators voiced any objection to [his] statement." 238 F. Supp. 3d 992, 1001 (S.D. Ohio 2017). The district court decision that we reversed in *Gallo v. Moen, Inc.*, 813 F.3d 265 (6th Cir. 2016), found that "Defendant Moen's representative told the UAW that future retirees would only need to pay the co-premium set in the agreement and they would be covered for life." 27 F. Supp. 3d 832, 852 (N.D. Ohio 2014). And in *IUE-CWA v. GE*, company "managers and human resources representatives advised union-represented employees to retire

before a new CBA took effect" to ensure their benefits would remain guaranteed for life. 745 F. App'x 583, 600 (6th Cir. 2018) (Stranch, J., concurring). Hundreds did so, suffering a lifetime of reduced pensions to maintain the promised healthcare coverage—which was then taken away from them. *Id.*; *see also Gallo*, 813 F.3d at 281 (Stranch, J., dissenting) ("One employee, for example, qualified for and took early retirement at age 58 and testified to suffering a 23% reduction in his lifetime monthly pension benefit."). In each case, we held that the CBAs were not ambiguous and so declined to look at the painfully clear evidence of what the parties intended—and what the employers promised.

*Tackett II* instructed us to *remove* our thumb from the scale, not move it to the other side. 135 S. Ct. at 935. Citing hornbook law, Justice Ginsburg noted that, "[u]nder the 'cardinal principle' of contract interpretation, 'the intention of the parties, to be gathered from the whole instrument, must prevail'"; she explained that in determining "what the contracting parties intended, a court must examine the entire agreement in light of relevant industry-specific 'customs, practices, usages, and terminology.'" *Id.* at 937–38 (Ginsburg, J., concurring) (quoting 11 Richard A. Lord, *Williston on Contracts* §§ 30:2, 30:4 (4th ed. 2012) (*Williston*)). But our cases have not adequately examined the whole of the contractual language, much less how the parties applied that language. "*Gallo v. Moen* has installed duration clauses as the new absolute determiner of intent, regardless of the actual intent of the parties." *Cole*, 855 F.3d at 702 (White, J., concurring) (citation omitted). We were instructed to focus on the records before us and to disregard our personal suppositions as "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Tackett II*, 135 S. Ct. at 935. We have not heeded this charge. Instead, we have engaged in suppositions that favor employers, such as assuming "that employers provided decades of benefits to retirees based on a heady mixture of altruism and

optimism," *IUE-CWA v. GE*, 745 F. App'x at 599 (Stranch, J., concurring); *see also Gallo*, 813 F.3d at 281 (Stranch, J., dissenting), while ignoring their on-the-record acknowledgements of contractual obligations.

I recognize that underlying all these cases is the drastic and unanticipated increase in the cost of healthcare benefits. *See IUE-CWA v. GE*, 745 F. App'x at 593 (Stranch, J., concurring). Realistically, lifetime healthcare benefits are a dead letter for employees of today and tomorrow. But when yesterday's employees have given consideration in return for a contractual promise of future benefits, unanticipated cost in making good on that promise is not a legal justification for denying the promise's existence. Nor is it an answer to say that parties now know what they must do in the future to vest benefits. The working men and women in these cases gave up pay and other benefits decades ago in a bargain for healthcare benefits in their old age. They are now retirees who need that healthcare, and they are not going to get it. For these retirees, there is no such thing as an opportunity to return to the negotiating table. I can only conclude that we have failed to heed "the principles of ERISA that command us to honor the fundamental duties of the law of trusts." *Id.* at 601.

If our interpretive rules and presumptions are not helping us discern what the parties intended, those rules and presumptions are broken. I do not think, however, that an interpretive solution is impossible under the parameters established by the Supreme Court. This case provides an example of how, operating within the proper parameters, one can find ambiguity in a CBA, specifically, the 2003 CBA at issue here.

## AMBIGUITY

In *Gallo*, we said that *Tackett II* did not create a "clear-statement rule." 813 F.3d at 274. Our later cases have unnecessarily moved toward such a requirement. This trend in our caselaw

resulted in the conclusion that where a CBA contains a general durational clause, it applies to healthcare benefits absent "clear, affirmative language" that indicates otherwise. *Fletcher*, 892 F.3d at 223. This case follows suit. But virtually all CBAs have a general durational clause. CBAs expire because collective bargaining is, by its nature, periodic. *See* 29 U.S.C. § 158(d) (requiring collective bargaining "at reasonable times"). On remand after *Tackett II*, we determined that the Supreme Court "declined to adopt an 'explicit language' requirement in favor of companies" and instead looked to ordinary contract principles. *Tackett v. M&G Polymers USA, LLC* (*Tackett III*), 811 F.3d 204, 209 (6th Cir. 2016). And "ordinary contract principles, shorn of presumptions" allow for the possibility of ambiguity. *Tackett II*, 135 S. Ct. at 937 (Ginsburg, J., concurring). Those principles instruct that "when the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties." *Id.* at 938 (citing 11 *Williston* § 30:7); *see also CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018) (per curiam).

**Governing Caselaw**

Supreme Court precedent does not require us to disclaim ambiguity. Nor does our own precedent reject ambiguity. *See Tackett III*, 811 F.3d at 208–09 ("When the contract is ambiguous, a court may consider extrinsic evidence to determine the intentions of the parties." (alterations omitted) (quoting *Tackett II*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring))). Our published cases decided in the wake of *Tackett* looked for ambiguity—albeit unsuccessfully. *See Gallo*, 813 F.3d at 273–74 ("Absent ambiguity from this threshold inquiry, no basis for going beyond the contract's four corners exists."); *see also Cole*, 855 F.3d at 700.

We came close to disclaiming the possibility of ambiguity in *Fletcher*, which purported to "distill a clear rule—a CBA's general durational clause applies to healthcare benefits unless it contains clear, affirmative language indicating the contrary." 892 F.3d at 223. But *Fletcher* did

not actually apply this rule. *Fletcher* framed its inquiry as a search for ambiguity: "Plaintiffs can succeed on their claims only if they prove one of two things: (1) the CBAs unambiguously provide retirees with lifetime healthcare benefits, or (2) the CBAs are ambiguous, and the extrinsic evidence demonstrates that the parties intended to vest retiree healthcare benefits." *Id.* at 221–22. *Fletcher* also stated that "the absence of specific vesting language does not automatically signify intent to terminate those benefits when the agreement expires," *id.* at 225, and then canvassed the CBAs for clues that could support a finding of ambiguity, *id.* at 224–27. The only way to reconcile *Fletcher*'s broad statement with its own interpretive approach, the caselaw that came before it, and the Supreme Court's requirements for contractual interpretation is to conclude that *Fletcher* did not reject out of hand the possibility of ambiguity.

**The CBA Context**

The Supreme Court's instruction in *Tackett II* included a caveat—we are to "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." 135 S. Ct. at 933 (citing *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957)). CBAs are creatures of federal labor policy, long "regarded as the effective instrument of stabilizing labor relations and preventing, through collective bargaining, strikes and industrial strife." *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 524 (1941). The language in CBAs governs not just the parties who sat at the negotiating table but also the hundreds or thousands of employees who approve the negotiated contracts. Ordinary principles of contract law are more than capable of accounting for this unusual context. "To determine what the contracting parties intended, a court must examine the entire agreement in light of relevant

industry-specific 'customs, practices, usages, and terminology.'" *Tackett II*, 135 S. Ct. at 937–38

(Ginsburg, J., concurring) (quoting 11 *Williston* § 30:4); *see also Reese*, 138 S. Ct. at 765.

### Application to this CBA

The question that should be asked—without applying any presumptions tilting the scales

in either direction—is whether the CBA is "reasonably susceptible to at least two reasonable but

conflicting meanings" and therefore ambiguous. *Reese*, 138 S. Ct. at 765. Here, I look specifically

to the 2003 CBA.

The 2003 CBA does not contain any clear statements about provision of benefits after the

agreement expires. It does not provide for "lifetime" or "vested" healthcare benefits. Nor does it

state that retirees' medical coverage will continue only "at their own expense," as did the 1977

CBA, or that benefits are terminable after the CBA expires.

In fact, the 2003 CBA does not clearly state much at all about retiree healthcare. The key

benefits provisions are found in a table written in shorthand:

**EXHIBIT 5**
**RETIREMENT HEALTH CARE**

|  | Eligibility | Benefit | Comments |
|---|---|---|---|
| Group #1 | Age 55 or more with at least 10 years of pension credit as of 12/31/03 | • Retiree health. No change if retired by 12/31/04 | Window Closes 1/31/04 |
| Group #2 | Age 55 or more and 10 or more years of pension credit by 6/5/05, but not in Group #1, or in Group 1 and not retired by 1/31/04 | • Retiree health: No change | • Regular Retirement<br>• Grandfathered to 6/29/08 |
| Group #3 | 85 points and 30 or more years of pension credit by 6/29/05, but not in Group #1 or #2 | • Access only to retiree health care. $10,000 lump sum payment.<br>• Or, if qualified by 6/5/05, may retire after 6/5/05 upon reaching eligibility requirements (e.g., 55 with 10 years) with the following health care:<br>-Cost share of 20% (of 80/20 plan)<br>-No change in current coverage<br>-Pre-65 coverage only | • Window until 6/29/05, pension only (no retiree health care)<br><br>- or -<br><br>• If qualified by 6/5/05 and retiring after 6/5/05, 20% cost share for medical to age 65. |

Neither the 2003 CBA nor any of its predecessor agreements explains what critical terms like

"Regular Retirement" or "Grandfathered" mean. Without even the minimal context that would be

provided by complete sentences, no court can know what the parties intended those words to mean.

A cryptic riddle in this table implies that the 2003 CBA might vest benefits for life. All employees in Group 3 were under the age of 55 in early June 2005.[1] When the 2003 CBA expired at the end of June 2008, the members of Group 3 were at most 59 years old—and yet the CBA takes care to note that they are entitled to "Pre-65 coverage only." We have previously explained that language providing benefits "until age 65" does not vest benefits until that age but merely "provide[s] for the expiration of those benefits even before the CBA itself expires." *Cooper v. Honeywell Int'l, Inc.*, 884 F.3d 612, 619 (6th Cir. 2018). An "until age 65" provision, we held, operates to terminate benefits for "a hypothetical 64-year-old" who is not entitled to coverage even for the full term of the CBA. *Id.* Here, no 64-year-old could be a member of Group 3. Every member of Group 3 was, by definition, at least six years short of turning 65 when the CBA expired—so if the parties intended benefits to expire with the CBA, the "Pre-65" limitation is meaningless. That reading contravenes the classic principle of ordinary contractual interpretation that "a contract 'should be read to give effect to all its provisions and to render them consistent with each other.'" *Gallo*, 813 F.3d at 270 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)).

In addition, a piece of key evidence, a letter incorporated into the 2003 CBA, states that retirees in Group 3 "shall have until 6/29/08"—the day the CBA expires—to "waiv[e] retiree medical insurance in exchange for a $10,000 lump sum payment." If the CBA provided for benefits only during its term, then on the day the contract expired, the benefits were effectively worthless. But the company thought that each employee's benefits were worth $10,000 even on

---

[1] Any employee with 10 or more years of pension credit who is over the age of 55 by that date must be in either Group 1 or 2; employees in Group 3 have well over 10 years of pension credit, so the only way they could be ineligible for membership in Group 1 or 2 is if they do not meet the age requirements.

the very last day the contract was in place. When the Fourth Circuit interpreted a CBA that required the employer "to make a $1.585 million contribution to [a benefits trust] on the very last day of the 2005 CBA's term," the court determined that it would "require[] an overactive imagination" to contend that the trust expired with the CBA. *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437, 441 (4th Cir. 2011). The employer here committed to making a substantial payment to buy out an employee's retiree medical insurance up until the very day that the CBA expired. It would take an expansive imagination to explain that payment as anything except the employer's acknowledgment that health insurance would continue to be a cost to it—and a benefit to its employees—after the CBA expired.

When read in combination, these provisions render the 2003 CBA reasonably susceptible to the interpretation that it vested benefits for life.

## INTENT

Because I think the 2003 CBA is ambiguous, I would look to the abundant record evidence to determine the intent of the parties. Viewing the evidence that the district court collected over the course of its five-day bench trial and considering the deferential standard of review applicable to this fact-based inquiry, *see Byrne v. United States*, 857 F.3d 319, 326 (6th Cir. 2017), this is an easy case.

Every union witness told the same story: The company's position "was always, what a person went out with is what they would have for life." "Their position was that that is a lifetime benefit, and you'd better be happy with what you have when you go out, because that's what you will have the day you pass away. It will never change." The company's lead negotiator, who testified so credibly that the district court said that "there could hardly have been a more trustworthy witness," appears to have agreed. He acknowledged that during negotiations, he stood

in front of a group of employees and said, "Everybody in this room, we made a promise that when you retire, you're going to have retiree medical insurance."

That same company negotiator explained that after the terms of the 2003 CBA were decided, he and a union representative would meet with groups of 100 employees at a time, and the union representative "would pronounce that these—these benefits for the retiree go on for the rest of your life." The company negotiator would never contradict that promise; he would only clarify that "welfare benefits do not enjoy the same protection that pension benefits do. For instance, in case of bankruptcy, there's no telling that you would have those benefits." He testified under oath that he "believe[d]" that "the intent of [himself] and the Union" was to give retirees "benefits for life." He was not alone in that belief; internal company documents from 2002 described the retirees' medical plans as "Lifetime." That evidence more than suffices to show that the parties intended the 2003 CBA to vest benefits for life.

## CONCLUSION

This case is not an aberration. Over and over again, companies promised their retirees lifetime healthcare benefits. But now, over and over again, we find that the contracts they negotiated unambiguously state the opposite. We thereby avoid the mountains of evidence that the parties intended exactly what they promised. I think that we have moved beyond the parameters articulated by the Supreme Court when we presume the necessity of a clear statement rule. And I find that requirement sadly ironic. In these cases, the contractual language was negotiated in a legal environment in which everyone understood it to constitute an ongoing promise, the employer publicly and repeatedly reiterated that promise in word (both spoken and written) and in deed, and working men and women relied on that promise. Because we changed the rules of the game after the game was over, I respectfully dissent.