*Xerox v. Loc. 14A, Rochester Reg'l Joint Bd., Xerographic Div. Workers United*

In the
# United States Court of Appeals
## For the Second Circuit

————————————

August Term 2023
Argued: February 22, 2024
Decided: February 5, 2025

Docket No. 23-634

XEROX CORPORATION,

*Petitioner-Appellee*,

v.

LOCAL 14A, ROCHESTER REGIONAL JOINT BOARD,
XEROGRAPHIC DIVISION WORKERS UNITED,

*Respondent-Appellant.*

————————————

Before:          WESLEY, CHIN, and LEE, *Circuit Judges.*

————————————

Xerox Corporation ("Xerox") filed a petition, under Section 301 of the Labor Management Relations Act ("LMRA"), for injunctive and declaratory relief against Local 14A, Rochester Regional Joint Board, Xerographic Division Workers United (the "Union"). After the collective bargaining agreement between Xerox and the Union expired, Xerox terminated retiree benefits. The Union argued that Xerox could not unilaterally terminate vested benefits and sought to enforce the expired agreement's arbitration provision. In its LMRA petition, Xerox sought to stay and enjoin arbitration.

The United States District Court for the Western District of New York (Geraci, *J.*) granted Xerox's petition, concluding that the Union's grievance was not arbitrable under the parties' expired collective bargaining agreement. The district court reasoned that the Union had failed to identify language in the agreement that could be understood to have promised vested benefits beyond the agreement's expiration, and, regardless, the reservation-of-rights clause in plan documents barred an interpretation that benefits had vested.

On appeal, the Union argues that the district court erred. We agree. First, the Union identified language that could be reasonably understood as guaranteeing benefits beyond the contract's expiration or as constituting deferred compensation. Second, the reservation-of-rights clause in plan documents did not conclusively bar an interpretation that benefits had vested. To discern the parties' intent, the appropriate trier of fact would need to consult extrinsic evidence.

Accordingly, we **VACATE** the district court's judgment and **REMAND** for further proceedings.

————————————

FOR PETITIONER-APPELLEE:	TODD R. SHINAMAN (Michael J. Lingle, *on the brief*), Nixon Peabody LLP, Rochester, NY.

FOR RESPONDENT-APPELLANT:	MICHAEL DOLCE, Hayes Dolce, Buffalo, NY.

————————————

WESLEY, *Circuit Judge*:

This appeal concerns the enforceability of an arbitration provision in an expired collective bargaining agreement ("CBA"). For decades, Xerox and the Union entered successive CBAs. That pattern has since ceased. In 2018, Xerox and

2

the Union entered what remains their most recent CBA. That CBA expired in 2021; there has been no successor agreement.

After the 2018–21 CBA[1] expired, Xerox announced modifications to health benefits provided to employees who retired before the CBA's expiration. In January 2022, Xerox made its modifications effective. By the Union's count, Xerox terminated retiree benefits for thousands of retirees and their families. Thereafter, the Union filed a grievance and demanded arbitration, arguing that the benefits had vested under a CBA and could not be terminated.

After denying the grievance and refusing arbitration, Xerox filed a petition in the district court, under Section 301 of the LMRA, to stay and enjoin arbitration and for declaratory relief. Xerox argued that, as a matter of law, the Union could not enforce the 2018–21 CBA's arbitration provision because it had expired. It acknowledged that an expired CBA's arbitration provision remains enforceable to protect vested rights. But Xerox argued that, here, no retiree benefits had vested as of the last CBA's expiration. The Union disagreed, pointing to various

---

[1] We refer to this CBA as a "contract" throughout this opinion. To the extent we make limited reference to any other labor agreements (i.e., prior CBAs), we refer to each using the title by which it appears in the record. *See infra* Section I.A.c.

3

provisions, including a survivor benefits' clause that plan participation "shall continue . . . until his or her death." J. App'x at 199, 231. Xerox responded that the provisions identified by the Union could not be understood as promising vested benefits beyond the contract's duration. Xerox also pointed to a reservation-of-rights clause in plan documents, arguing that it precluded any interpretation that the agreement had vested benefits.

The district court agreed with Xerox that the Union's grievance was not arbitrable, reasoning that the language identified by the Union could not be understood to vest retiree benefits beyond the duration of the CBA, and, regardless, the reservation-of-rights clause barred an interpretation that benefits had vested.

The Union argues that the district court erred. We agree. The language identified by the Union can be reasonably understood as guaranteeing benefits beyond the contract's expiration or as constituting deferred compensation. In addition, the reservation-of-rights clause does not conclusively bar an interpretation that benefits vested.

We therefore vacate the district court's judgment and remand for further proceedings.

# BACKGROUND

## I.      Factual Background

### A.  The 2018–21 CBA

In 2018, Xerox and the Union entered their most recent CBA ("the 2018–21 CBA"). The CBA was extensive, covering numerous issues: hours of work, wages, benefits, strikes, layoffs, seniority, retirement, grievance procedure, and temporary layoffs, among other topics. Relevant here are the provisions on the duration of the agreement, grievance procedure, and retirement.

#### a.  Term of Agreement

The 2018–21 CBA became effective on June 11, 2018, and "continue[d] in force and effect until and including September 30, 2021, and thereafter, from year to year," unless either party gave timely written notice "of its intention to have this Agreement changed, altered, amended or terminated." J. App'x at 77. The parties later agreed to extend the CBA until November 30, 2021.

#### b.  Grievance Procedure

The 2018–21 CBA set out a multi-step "Grievance Procedure" for unresolved complaints, in which the last step was arbitration. At Steps 1, 2, and 3, the parties would seek to resolve grievances via meetings and written communications. If a

grievance was "not satisfactorily settled at Step 3," then (at Step 4) it could be "appealed to arbitration" by timely written notice. J. App'x at 67.

### c. Retirement

The 2018–21 CBA set forth eligibility requirements and the provision of benefits for retirees and their dependents in "Schedule H." Schedule H delineated four types of benefits: Life Insurance, the Medical Care Plan, the Dental Plan, and the Flexible Benefit Account. Schedule H described each of these benefits, providing specific amounts for deductibles, out-of-pocket expenses, and allowances, and detailing eligibility for coverage based on date of retirement eligibility and date of retirement, covering employees yet to retire, as well as those who had retired years earlier. However, Schedule H also stated that "[t]his Schedule is intended as an outline only and the benefits described are subject to the detailed terms and conditions of the actual plans or contracts, as well as to the provisions of applicable state and federal laws." J. App'x at 120.

As to the Medical Care Plan, Schedule H identified three categories of coverage: employees who had reached retirement eligibility before 1989 would receive coverage as described in the 1980–83 Labor Agreement; employees who were not retirement-eligible before 1989 and who retired between 1989 and 1994

6

would receive coverage as described in the 1989–92 Labor Agreement, with some modifications; and employees who were not retirement eligible before 1989 and retired after 1994 would receive a "Benefits Allowance."

These three coverage categories corresponded to three different plans: (1) the Xerox Medical Care Plan for Retired Employees (the "Old Plan"); (2) the Xerox Retiree Health Care Plan (the "New Plan"); and (3) the Xerox Corporation Retiree Health Reimbursement Plan (the "HRA Flex Plan" or "HRA Plan"). This three-plan scheme for retiree medical care benefits had originated decades earlier but had been part of each successive CBA since. The specific plan documents detailing the three medical care plans were amended and restated over the years; the most recent versions in the record, and on which both parties rely, are from 2016.

The 2016 Amendment and Restatement for both the Old Plan and the New Plan stated that retirees and eligible dependents would continue participating in their respective plans until the retiree ceased paying contributions or being a retiree, and, upon a retiree's death, their spouse or domestic partner, provided they continued making contributions, would continue as a plan participant "until his or her death." J. App'x at 199, 231. The 2016 Amendment and Restatement for

7

each of the three plans—the Old Plan, the New Plan, and the HRA Flex Plan—also contained reservation-of-rights clauses.

### B. Post-Expiration Events

The 2018–21 CBA expired on November 30, 2021; the parties have not entered a successor agreement.

In December 2021, shortly after the 2018–21 CBA expired, Xerox announced that it was going to modify health benefits for individuals who retired before the CBA's expiration. Thereafter, the Union submitted a "Grievance Report," claiming that Xerox's plan would "modify and/or terminate benefits which had accrued and/or vested under the agreement, causing numerous violations of the CBA, including but not limited to violations of Article VIII and any other applicable provisions." J. App'x at 187. (Article VIII of the 2018–21 CBA was the section on benefits, which incorporated Schedule H on Retirement.)

Xerox rejected the Union's grievance, concluding that the "grievance is without merit because neither the main body of the [CBA] nor the plan documents incorporated in it by reference contain clear and unambiguous language sufficient to vest benefits for life under well-established legal precedent." J. App'x at 9.

8

The Union sought to arbitrate. Xerox declined, noting that the CBA had expired, and therefore "there is no arbitration provision currently in effect." J. App'x at 10. The Union replied with a "Notice of Intent to Arbitrate," demanding that Xerox submit to arbitration.

In the meantime, Xerox implemented its plan to modify retiree benefits. By the Union's count, more than 2,000 retirees and relatives lost their health and life insurance benefits as a result.

## II. Procedural Background

Upon receiving the Union's "Notice of Intent to Arbitrate," Xerox turned to the district court. Xerox filed a petition, under Section 301 of the LMRA, and a

motion, both seeking to enjoin and permanently stay the arbitration, and requesting declaratory relief.[2]

Xerox argued that the Union could not arbitrate its grievance, as a matter of law, because the 2018–21 CBA's arbitration provision expired with the CBA, and the grievance did not involve "any action taken by Xerox that infringes upon any right that accrued or vested under the CBA." J. App'x at 11. According to Xerox, the 2018–21 CBA "lacks clear and unambiguous language sufficient to vest any benefits for the life of the retiree," and, in any event, the incorporated plan documents contained "clear and unequivocal reservation of rights language permitting Xerox to amend, suspend, or terminate the plan at any time and for any reason." *Id.*

---

[2] Under Section 301(a) of the LMRA, district courts have jurisdiction over "[s]uits for violation[s] of contracts between an employer and a labor organization." 29 U.S.C. § 185(a). However, a party need not allege a violation by the opposing party to properly invoke Section 301(a) jurisdiction. *Black-Clawson Co., Paper Mach. Div. v. Int'l Ass'n of Machinists Lodge 355, Dist. 137*, 313 F.2d 179, 181 (2d Cir. 1962). As here, Section 301(a) jurisdiction lies over an action that "alleges compliance with the contract and requests protection by declaratory judgment against improper demands for arbitration." *Id.* at 182; *cf. Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 658 (1998) (holding that Section 301(a) jurisdiction "does not lie" when the party bringing suit "neither alleges that [the other party] has violated the contract, nor seeks declaratory relief from its own alleged violation").

Xerox also argued, among other things, that there was "no valid agreement to arbitrate any grievance brought by the Union on behalf of retirees" because the 2018–21 CBA's "Grievance Procedure" only covered "employees," not retirees. J. App'x at 11.

The Union filed an answer, moved to dismiss Xerox's petition, and cross-moved to compel arbitration and for injunctive relief pending resolution of arbitration. The Union argued that plan documents, including the 2016 Restatements of the Old Plan and the New Plan, "contain[ed] language 'capable of reasonably being interpreted' as vesting language, and the dispute must be resolved by the trier of fact." J. App'x at 942. The Union pointed to the participant eligibility and "surviving spouse" clauses, arguing that they promised benefits for the retiree until the retiree died or got another job, and promised benefits for eligible surviving dependents until their death. The Union also argued that the pre-65 "Benefits Allowance" was "fixed under the contract but as yet unsatisfied." J. App'x at 948. As to the reservation-of-rights language, the Union argued that it had not been incorporated into the 2018–21 CBA because "the CBA is an independent source of retiree benefits and employer contributions to those benefits." J. App'x at 956.

11

The district court granted Xerox's petition and motion to stay arbitration and for declaratory relief, and denied the Union's motions. The district court agreed with Xerox that "the retiree health benefits did not vest pursuant to the CBA and, thus, [Xerox]'s modification of those benefits after the expiration of the CBA is not subject to the CBA's arbitration provision." *Xerox Corp. v. Loc. 14A, Rochester Reg'l Joint Bd.*, No. 22-CV-6219-FPG, 2022 WL 17822137, at *5 (W.D.N.Y. Dec. 20, 2022).

The district court reasoned that the "references to a retiree's 'death'" in the Old Plan and New Plan were insufficient to infer that retiree benefits "vested for life." *Id.* at *4. It noted that the "use of a retiree's actuarily calculated life expectancy" to determine benefits under the HRA Plan did "not show an intent to vest such a benefit" because the "life expectancy language is but one of several factors used to calculate a retiree's benefit allowance under the HRA [P]lan." *Id.* Moreover, "in the absence of 'clear and express' [vesting] language," the inclusion

12

of "'reservation of rights' language" supported the conclusion that the dispute was not arbitrable.[3]  *Id.* at *5.  The district court entered judgment for Xerox.

The Union timely moved to alter the judgment pursuant to Federal Rule of Civil Procedure 59(e), arguing that this Court's decision in *Local Union 97, IBEW v. NRG Energy, Inc.*, 53 F.4th 42 (2d Cir. 2022) was an intervening change in controlling law.  The court denied the Union's Rule 59(e) motion, concluding that *NRG Energy* had "at most, clarified the legal standard," and confirming that it had applied that standard: its prior decision had determined that the Union "did not meet its burden of identifying 'written language capable of reasonably being interpreted' to create a promise to vest."  J. App'x at 1109.  This appeal followed.

## DISCUSSION

### I.    Legal Standards

Because "an expired contract has by its own terms released all its parties from their respective contractual obligations," an expired CBA, like any expired contract, is generally unenforceable.  *Litton Fin. Printing Div., Litton Bus. Sys., Inc.*

---

[3] The district court also concluded that declaratory relief was warranted, stating that (1) the CBA "did not vest lifetime retiree health benefits past the duration of the CBA"; (2) there was "no existing agreement to arbitrate the issues or claims set forth in [the Union]'s arbitration request"; and (3) the Union's grievance was "not arbitrable under the now-expired CBA."  *Xerox*, 2022 WL 17822137, at *5.

13

*v. NLRB*, 501 U.S. 190, 206 (1991). However, "structural provisions relating to remedies and dispute resolution—for example, an arbitration provision—may in some cases survive in order to enforce duties arising under the contract." *Id*. at 208. In *Litton*, the Supreme Court explained that

> [a] post[-]expiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id.* at 205–06.

When a party claims that a right vested under a CBA, "[i]n this Circuit, to reach a trier of fact, an employee does not have to 'point to unambiguous language to support a claim. It is enough to point to written language *capable of reasonably being interpreted* as creating a promise on the part of the employer to vest the recipient's benefits.'" *Am. Fed'n of Grain Millers v. Int'l Multifoods Corp.*, 116 F.3d 976, 980 (2d Cir. 1997) (alterations adopted) (quoting *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 78 (2d Cir. 1996)). In other words, when the CBA's language is "reasonably susceptible to interpretation as a promise" to vest, the "ultimate determination . . . should be left to a trier of fact, likely assisted by extrinsic

evidence to clarify the meaning of th[e] ambiguous language." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 84–85 (2d Cir. 2001).

If a party successfully points to written language capable of reasonably being interpreted as vesting benefits and also argues that its vesting claim is arbitrable, then the trier of fact to which the vesting claim would proceed is the arbitrator. As our former colleague Judge Pooler once noted, courts "need not determine the merits to find that the grievance is arbitrable." *NRG Energy*, 53 F.4th at 55.[4] Rather, courts need decide only whether the union identified "written

---

[4] In *NRG Energy*, this Court examined not only the enforceability of an expired arbitration provision, but also the scope of an arbitration provision, or whether it applies to the type of dispute at issue. 53 F.4th at 50–55. In considering the scope issue, *NRG Energy* applied a two-step framework, classifying the arbitration clause as broad or narrow, and if broad, applying a presumption of arbitration. *Id.* at 49–50. Xerox argues that "there is good reason to doubt that *NRG Energy*'s application of a presumption withstands scrutiny under Supreme Court precedent." Appellee's Br. at 22. Xerox points us to *Local Union 97, IBEW v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (*per curiam*), in which this Court clarified our standard for invoking a presumption of arbitrability in light of the Supreme Court's decision in *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010). To the extent *Niagara Mohawk*'s clarification is relevant to this case, it relates to Xerox's secondary argument that, regardless of post-expiration enforceability, the CBA's grievance procedure did not apply to retirees—an argument the district court did not yet reach, and one which we do not address here. For now, we are concerned only with whether language in the CBA could be reasonably interpreted to have vested benefits, such that its arbitration provision could be enforced post-expiration. In these circumstances, applying a presumption of vesting would amount to applying a presumption of arbitrability. But we do not apply a presumption of vesting; rather, we apply ordinary principles of contract interpretation. *See infra* at 16–18.

15

language capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipient's benefits." *Id.* (quoting *Devlin*, 274 F.3d at 83). If so, then the underlying vesting claim proceeds to the arbitrator—as the trier of fact—to conclusively resolve whether benefits had vested, consulting extrinsic evidence if necessary. *See id.*

Of course, if the written language of the agreement is *not* capable of reasonably being interpreted to vest benefits, then the vesting dispute is done. In concluding that the dispute is not arbitrable, the court necessarily decides the underlying merits of the vesting claim. As the Supreme Court explained in *Litton*, if the CBA's language "cannot be said to create a right that vested or accrued during the term of the Agreement," 501 U.S. at 210, then the court's "decision that the dispute does not arise under the Agreement does, of necessity, determine that . . . the employees lacked any vested contractual right," *id.* at 210 n.4.

Ordinary principles of contract law come into play in determining whether the language in question is capable of being reasonably interpreted to vest benefits. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) (*per curiam*). In *Tackett*, the Supreme Court clarified that courts must "interpret [CBA]s . . . according to ordinary principles of contract

16

law, at least when those principles are not inconsistent with federal labor policy." 574 U.S. at 435. Courts cannot "plac[e] a thumb on the scale in favor of vested retiree benefits." *Id.* at 438. Rather, there must be "record evidence" supporting that inference. *Id.* at 439. And "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id*. at 442.

In *Reese*, the Supreme Court again emphasized that courts must "apply ordinary contract principles" when evaluating whether a CBA vested benefits. 583 U.S. at 139. There, the Sixth Circuit had "found ambiguity" by "erroneously presum[ing] lifetime vesting from silence." *Id*. at 137–39. The Court explained that "when a contract is ambiguous, courts can consult extrinsic evidence to determine the parties' intentions," but a CBA is "not ambiguous unless, after applying established rules of interpretation, it remains reasonably susceptible to at least two reasonable but conflicting meanings." *Id*. at 139 (alteration adopted) (internal quotation marks omitted). Mere silence is insufficient to find ambiguity. *Id.* at 140.

To enforce an expired CBA's arbitration provision premised on the CBA's promise of vested benefits, we therefore require specific language, not simple

silence, that can be reasonably interpreted, under ordinary principles of contract law, as a promise to vest. There is no blanket presumption of vesting. *See, e.g.*, *NRG Energy*, 53 F.4th at 55; *Devlin*, 274 F.3d at 84, 85; *Multifoods*, 116 F.3d at 980. If we determine that the matter is arbitrable, then the arbitrator, as the trier of fact, makes the ultimate determination as to whether benefits vested, consulting extrinsic evidence if necessary. *See NRG Energy*, 53 F.4th at 55; *Devlin*, 274 F.3d at 83.

We review a district court's interpretation of a contract, including an expired CBA, *de novo*. *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 178 (2d Cir. 2019). "[W]e first consider whether the [C]BA contains language vesting retiree . . . benefits. If so, we consider whether other contractual provisions—such as a reservation of rights clause—defeat vesting." *Id*. at 179.

## II.     Vesting Language

The Union identified language or incorporated language in the 2018–21 CBA capable of reasonably being interpreted as creating a promise on the part of Xerox to vest retiree benefits.[5]  The district court erred in concluding otherwise.

### A. Durational Language in the Old Plan and New Plan

Although contractual obligations generally cease upon termination of the CBA, parties may provide that "certain benefits continue after the agreement's expiration."  *Tackett*, 574 U.S. at 442 (quoting *Litton*, 501 U.S. at 207).  To support a claim that an agreement promised vested benefits that would extend past the contract's expiration, a party may point to written language that "tie[s] the benefits that a recipient will receive to that recipient's lifetime or to an indefinite duration."  *Kelly*, 933 F.3d at 180.  "For example, contractual language stating that retirees' life insurance benefits will remain at a stated level 'for the remainder of their lives' can

---

[5] Xerox and the Union disagree about which of their past CBAs and plan documents the Union may rely upon in seeking to identify vesting language.  Xerox argues that only the language in the 2018–21 CBA (and incorporated plan documents) are properly considered in this dispute, while the Union contends that we should also consider the language of earlier expired CBAs (and incorporated plan documents).  Because we conclude that the Union identified language in the 2018–21 CBA (and incorporated plan documents) that could be reasonably interpreted to vest benefits, we need not and do not resolve whether the Union could also rely on language in earlier documents, either principally or as extrinsic evidence.

reasonably be interpreted to 'create a promise to vest lifetime life insurance benefits.'" *Id.* (alteration adopted) (quoting *Devlin*, 274 F.3d at 85).

Here, the Union identified the following language in the 2016 Amendment and Restatement for both the Old Plan and New Plan, which the parties agree was incorporated by reference in Schedule H of the CBA:

> [E]ach Retiree . . . *continues participation* in the Plan . . . *until* the earlier of the date on which the Retiree ceases to pay the contributions . . . or the close of business on the day the Retiree ceases to be a Retiree . . . .

J. App'x at 197 (emphasis added); *see also* J. App'x at 199, 224, 229.

> In the event of the death of a Retiree while a Participant under this Plan . . . the Eligible Dependent Spouse or domestic partner of such Retiree *shall continue* as a Participant in the Plan *until his or her death*.

J. App'x at 199, 231 (emphasis added). The Union argued that these clauses vested benefits by guaranteeing them until an event that could occur after the 2018–21 CBA's expiration, namely when the Retiree ceases to pay the contributions, ceases to be a Retiree, or when the Retiree's surviving spouse or domestic partner dies.

This Court has previously considered similar, but not identical, language. In *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1999), we considered language providing for the "'termination' of retiree insurance upon a retiree's 'death or

20

attaining the age at which he becomes or could become eligible for Medicare.'" *Id.* at 134. We concluded that this language could not "reasonably be read as binding [the employer] to vest the benefits at issue." *Id.* The retirees had "fail[ed] to identify language that affirmatively operates to imply vesting." *Id*. at 135.

By contrast, in *Kelly*, we had "little trouble" concluding that a bargaining agreement contained "affirmative lifetime language." 933 F.3d at 180. There, we concluded that language providing that "retired employees and surviving spouses shall continue to receive" medical coverage "for the life of the retiree or surviving spouse" showed "the parties' intent to secure medical coverage for qualifying retirees' lifetimes." *Id.* (emphasis omitted).

The language the Union identified here is capable of reasonably being interpreted as a promise to vest benefits. *Joyce* and *Kelly* turned on whether there was "affirmative" language that implied vesting. *Joyce,* 171 F.3d at 135; *Kelly*, 933 F.3d at 180. This distinction explains why the negative implication that benefits would "*terminate* upon death" failed to indicate vesting in *Joyce,* while the affirmative implication that benefits "*shall continue* for life" did point to vesting in *Kelly*.

21

It follows that, in this case, the affirmative language stating that a surviving spouse "shall continue" as a plan participant "until" death, and that living retirees "continue" as participants "until" they stop contributing or being retirees, could be reasonably interpreted as vesting benefits beyond the CBA's expiration. As in *Kelly*, this language could be read to affirmatively "assign a specific duration to retirees' medical coverage that extends beyond the duration of the contract[]." 933 F.3d at 183.

In concluding that the language here is capable of reasonably being interpreted to promise vested benefits that extend beyond the CBA's expiration, we find support from our sister circuits. The Fifth and Eighth Circuits have described "until death" language as "highly probative of [an] intent to vest benefits." *Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp.*, 122 F.3d 228, 232 (5th Cir. 1997) (quoting *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1518 (8th Cir. 1988)); *see also Tackett*, 574 U.S. at 444 (Ginsburg, *J.*, concurring) (confirming that relevant to determining "whether the parties intended retiree health-care benefits to vest" would be a "'survivor benefits' clause instructing that if a retiree dies, her surviving spouse will continue to receive the retiree's health-

care benefits until death or remarriage" (alterations adopted) (internal quotations omitted)).

Similarly, the Fourth and Ninth Circuits have reasoned that "where a CBA links eligibility for a particular right 'to an event that would almost certainly occur after the expiration of the agreement'—*e.g.*, turning 65 or becoming eligible for Medicare—such linkage 'signals the parties' intent to continue retirement health benefits notwithstanding expiration.'" *Alday v. Raytheon Co.*, 693 F.3d 772, 785 (9th Cir. 2012) (quoting *Quesenberry v. Volvo Trucks N. Am. Retiree Healthcare Benefit Plan*, 651 F.3d 437, 441 (4th Cir. 2011) (alteration adopted)); *see also Poore v. Simpson Paper Co.*, 566 F.3d 922, 924, 927 (9th Cir. 2009) (holding that where "coverage would continue until the retiree 'became eligible for Medicare, attained age 65, or until death, whichever occurs first,'" the retirees "stated at least a colorable claim that they have a right to benefits which survived the expiration of the remainder of the agreement" (alterations adopted)).

Xerox points us to *Grove v. Johnson Controls, Inc.*, 694 F. App'x 864 (3d Cir. 2017), and *Crown Cork & Seal Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 501 F.3d 912 (8th Cir. 2007). But in those cases, the Third and Eighth Circuits merely concluded that the language "continues until your death" was not

"necessarily" or "explicit[ly]" vesting language, and thus did not consider, as we do here, whether other language in the contract rendered a vesting interpretation unreasonable. *Grove*, 694 F. App'x at 868 ("[T]he phrases referring to a retiree's 'death' are not necessarily durational in nature . . . ."); *Crown Cork*, 501 F.3d at 918 (holding that the provision promising coverage "until death" was "not explicit vesting language"). Only after considering other language in the agreements did those courts conclude that the "continues until your death" language had failed to vest lifetime benefits. *Crown Cork*, 501 F.3d at 918; *Grove*, 694 F. App'x at 869–70; *see also Cherry v. Auburn Gear*, 441 F.3d 476, 483–86 (7th Cir. 2006) (similarly reasoning that other contract terms may reveal that "lifetime benefits" were not "vested benefits").

Even the Sixth Circuit, perhaps the greatest skeptic of the idea that language that "promises to 'continue' providing benefits" amounts to a promise of vested benefits beyond the contract's duration, recognizes the possibility that it may. *Cooper v. Honeywell Int'l Inc.*, 884 F.3d 612, 620 (6th Cir. 2018). In *Cooper*, the Sixth Circuit considered language providing that benefits would continue "until age 65" and emphasized that "when a CBA provision promises to 'continue' providing benefits, we can assume only it *guarantees* benefits until the agreement expires,

24

nothing more." *Id.* (alteration adopted) (internal quotation marks omitted). However, the Sixth Circuit clarified that there was "no hard-and-fast rule that a provision cannot delineate eligibility for retiree benefits during the CBA's operation and *also* serve to vest benefits beyond the CBA's duration," acknowledging that there could be "clues . . . from the CBA supporting that intent." *Id*.

To be sure, we do not understand any circuit to have suggested that promising to continue benefits until death, or some other future event, is absolute or always vesting language. Nor do we today. Our task is only to see if it is a reasonable conclusion. Here, providing coverage that will "continue until death," or until some other event likely to occur after the CBA's expiration, can be reasonably, though not necessarily, interpreted to promise vested benefits that extend beyond the CBA's expiration.

## B. Deferred Compensation in the HRA Flex Plan

The Union also argued that language in the CBA's description of the HRA Flex Plan was capable of being reasonably interpreted to have vested benefits, during the term of the 2018–21 CBA, that remained yet unsatisfied. Schedule H

provided that for certain "Pre-65 retirees," the "Benefits Allowance" consisted of the "Basic Allowance" and the following:

> To the Basic Allowance will be added a Service Component in an amount equal to $20 times total years of service with the Company up to a maximum of 30 years and a LifeCycle Assistance Program Component based on the employee's forfeited balance in the LifeCycle Assistance Program spread over the retiree's expected lifetime using accepted actuarial assumptions (this amount will be included in the retiree's Benefits Allowance each year).

J. App'x at 121. The Union argued that this provision provided for a "Benefits Allowance" that accrued or vested during the term of 2018–21 CBA because it increased with additional years of service and could be the result of having chosen to save a benefit for retirement instead of spending it while employed. We conclude that the Union's interpretation is a reasonable one.

The Supreme Court has recognized that a benefit or pay may "constitute[] a form of deferred compensation that created a right that vested or accrued during the term of the agreement." *NRG Energy*, 53 F.4th at 50. In *Nolde Brothers v. Local No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243 (1977), the Supreme Court held that a "[u]nion's claim for severance pay under the expired collective-bargaining agreement is subject to resolution under the arbitration provisions of that contract." *Id.* at 255. The union had argued that the severance pay was "in

26

the nature of 'accrued' or 'vested' rights, earned by employees during the term of the contract on essentially the same basis as vacation pay, but payable only upon termination of employment." *Id.* at 248. Notable support for "the [u]nion's position that severance pay was nothing more than deferred compensation" was "[t]he fact that the amount of severance pay to which an employee [was] entitled under the collective-bargaining agreement varie[d] according to the length of his employment and the amount of his salary." *Id.* at 248 n.4.

By contrast, in *Litton*, the Supreme Court rejected a union's attempt to characterize a layoff provision as deferred compensation. 501 U.S. at 209–10. There, the agreement provided that "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal." *Id.* at 209. The union in *Litton* argued that this consideration of seniority "create[d] a form of earned advantage, accumulated over time, that can be understood as a special form of deferred compensation for time already worked." *Id.* The Supreme Court disagreed, explaining that the layoff order "was to be determined primarily with reference to 'other factors such as aptitude and ability,'" which "do not remain constant, but change over time," and "cannot be

27

said to vest or accrue or be understood as a form of deferred compensation." *Id.* at 210.

Here, we conclude that the "Benefits Allowance" provision is capable of being reasonably interpreted as "constitut[ing] a form of deferred compensation that created a right that vested or accrued during the term of the agreement." *NRG Energy*, 53 F.4th at 50. The allowance is increased by a "Service Component" that equals $20/year of service, with a 30-year cap. Thus, as with the severance pay considered in *Nolde*, the "Benefits Allowance" to which an eligible pre-65 retiree is "entitled under the collective-bargaining agreement varies according to the length of his employment." *See* 430 U.S. at 248 n.4.

Also added was the "LifeCycle Assistance Program Component," which consisted of the remaining balance in the employee's "LifeCycle" account, disbursed yearly based on their actuarial life expectancy. Because the "LifeCycle" account was a benefit available during employment, but could be used for retirement if the employee retired before age 65, we conclude that it too could be reasonably viewed as deferred compensation for work already performed.

The district court, however, rejected the Union's "contention that the use of a retiree's actuarily calculated life expectancy" vested benefits, reasoning that the

28

"life expectancy language is but one of several factors used to calculate a retiree's benefit allowance under the HRA plan." *Xerox*, 2022 WL 17822137, at *4. Xerox agrees.

We agree that an agreement's use of an actuarial calculation of life expectancy, alone, does not suggest a promise to vest lifetime benefits. But this fails to confront the Union's argument here. The Union views the "Benefits Allowance" for pre-65 retirees as the severance pay in *Nolde*, emphasizing that it was dependent on the retiree's years of service, as well as on benefits that a retiree *earned* and *saved* while employed.

The district court was also correct to observe that the allowance had multiple components. But here, the only other component was the simple addition of another fixed-dollar amount set by the CBA. The order of layoffs in *Litton* was not deferred compensation because it primarily considered factors that "cannot be measured on some universal scale, but only by matching an employee to the requirements of an employer's business at that time." 501 U.S. at 210. Unlike *Litton*'s layoff provision, the allowance's incorporation of years of employment or remaining unused benefits was not conditional, discretionary, or based on a subjective assessment.

Because the total "Benefits Allowance" for pre-65 retirees varies based on length of employment and a balance of benefits that accrued during employment, we conclude that it is capable of being reasonably understood as deferred compensation that vested during the term of the 2018–21 CBA.[6]

## III.    Reservation-of-Rights Language

The 2016 Amendment and Restatement for each of the three plans—the Old Plan, the New Plan, and the HRA Flex Plan—contained the following reservation-of-rights clause:

> The Company specifically reserves the right to amend, suspend or terminate the Plan described herein at any time and for any reason.

---

[6] The Union also argues that the retiree life insurance provision could be reasonably interpreted to have vested life insurance benefits for life. The district court did not explicitly consider this argument, apparently because it was not raised below, or at least before the district court had entered judgment. In any event, we disagree. The Union relies on *NRG Energy*, which this Court decided shortly before the district court entered judgment. In *NRG Energy*, this Court concluded that a union's dispute over "'grandfathered' life insurance" was arbitrable under an expired agreement because it could be reasonably interpreted as a promise to vest life insurance benefits. 53 F.4th at 54–55. Here, though, the life insurance provision does not include the term "grandfathered" or any other durational language. The Union's argument relies solely on the nature of life insurance, in that it is not payable until death. *NRG Energy* does not help. *NRG Energy* was clear that "other than the word 'grandfathered' there [was] no specific durational language indicating that the life insurance benefit vests for life." *Id.* at 55. By the Union's logic, a grant of life insurance for a limited duration could nevertheless be interpreted to extend beyond that duration. Under ordinary principles of contract law, this cannot be.

J. App'x at 206, 238, 279. The district court agreed with Xerox that, even if the 2018–21 CBA could otherwise be interpreted to vest benefits, this reservation-of-rights clause barred a conclusion that benefits vested. We are not convinced.

This Court has considered how a reservation-of-rights clause affects the possibility that an employer still promised vested benefits, but not in circumstances quite like these.[7] In *Multifoods*, we considered a union's argument that the summary plan description ("SPD") for a welfare benefits plan had provided vested retiree benefits. 116 F.3d at 982–83. Because the parties had CBAs stating that the employer would provide medical insurance to retirees and that the "SPD supplied the terms of that coverage," the retirees' Section 301 claims arising out of the CBAs would "succeed or fail based on the language of the SPD." *Id.* at 982. Ultimately, we concluded "that the SPD could not reasonably be interpreted as promising vested benefits." *Id.* (Unlike this case, the union identified no affirmative durational language or anything suggesting deferred compensation.)

---

[7] In *Kelly*, we considered a company's argument that "a benefit-specific cancellation clause . . . prevent[ed] the retirees' medical benefits from vesting and [was] the functional equivalent of a reservation of rights clause." 933 F.3d at 180. But we concluded that the cancellation clause did not in fact reserve the company's right to terminate or amend benefits. *Id.* at 182.

31

Although this conclusion was "sufficient to dispose of [the] plaintiffs' argument, we note[d] that the SPD also expressly reserved [the employer]'s right to 'terminate' the plan," and observed "that if an employer has not promised vested benefits in a SPD, and the employer expressly reserves the right to terminate the plan in the SPD, benefits promised in the SPD are not vested." *Id.* We noted, however, that we were "not faced with the question of how a document should be interpreted when it includes a general statement that all the benefits provided under the plan could be amended or terminated but also includes specific terms which could reasonably be interpreted as promising vested retiree benefits." *Id*. at 982–93. Because the SPD "could not reasonably be interpreted as promising vested benefits," we did not address "whether a specific promise of vested benefits can be defeated by a general reservation of the right to amend or terminate a plan." *Id*. at 983.

Later, in *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90 (2d Cir. 2001), we considered a contractual vesting claim brought by retirees under the Employee Retirement Income Security Act of 1974 ("ERISA"), arising solely out of plan documents and communications, not a CBA. One group of retirees relied on a single SPD. Confronted with "SPD language that *both* appears to promise

lifetime life insurance coverage . . . *and* clearly reserves [the employer]'s right to amend or terminate such coverage," we decided the question left open in *Multifoods*. *Id*. at 99. "Because the same document that potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were subject to modification, we conclude[d] that the language contained in the [SPD] [was] not susceptible to an interpretation that promises vested lifetime life insurance benefits." *Id*.

However, another group of retirees relied on materials that *were* "susceptible to interpretation as a promise of vested benefits." *Id.* at 98. Like the SPD, these materials included *both* a provision of lifetime benefits *and* a reservation of rights, but, unlike the SPD, the reservation-of-rights provisions were not "unambiguous." *Id.* For example, the "Voluntary Separation Opportunity Program" ("VSOP") provided for a "lifetime" life insurance benefit, but also "reserve[d] the right to amend and/or terminate the VSO *Program* at any time for any purpose." *Id.* at 97. We concluded that this reservation did not "*unambiguously* reserve[] [the employer]'s right to reduce the life insurance benefits provided by the VSOP." *Id.* at 98. Instead, we reasoned that "this language [was] capable of being interpreted to mean that [the employer] merely

33

reserved the right to change the *program* for those individuals who have not already retired under the terms described, not the right to alter the described benefits for those individuals who had retired under those terms." *Id.*

Here, if the Union's vesting claim arose exclusively out of the plan Restatements, our reasoning in *Abbruscato* would likely dictate that the reservation-of-rights clause barred an interpretation that other language in the same Restatement promised vested benefits. As with the SPD in *Abbruscato*, the reservation-of-rights is unambiguous within the Restatement itself—it clearly states that Xerox can "amend, suspend or terminate *the Plan described herein* at any time and for any reason." J. App'x at 206, 238, 279 (emphasis added); *see Abbruscato*, 274 F.3d at 98–99 (considering SPD clause providing that the company "reserves its right to amend each of the Plans at any time" (emphasis omitted)).

But the Union's claim that its retirees are entitled to vested benefits does not arise solely out of the plan Restatements; rather, the Union argues that its retirees are entitled to vested benefits under the CBA. In relation to a bargained-for agreement—which outlined retiree benefits that would be "subject to the detailed terms and conditions of the actual plans or contracts"—the reservation-of-rights clause in the plan Restatements—permitting Xerox to nevertheless modify or

terminate "the Plan described herein at any time and for any reason"—fails to remain unambiguous. J. App'x at 120, 206, 238, 279.

The district court and Xerox point us to cases in other circuits. But reviewing those cases confirms our conclusion that the combination of language we have here, in these circumstances, is ambiguous. The varying reasoning from our sister circuits indicates that there are a number of different ways to read a plan's reservation-of-rights clause consistently with a CBA, and here, it is unclear which of these interpretations the parties intended.

For starters, some circuits have concluded that CBA language cannot be interpreted to guarantee vested benefits past the CBA's expiration when an incorporated plan document includes a reservation-of-rights clause. In *Cooper*, cited by the district court, the Sixth Circuit considered a union's claim that a collective bargaining agreement had promised benefits beyond the agreement's expiration, until age 65. 884 F.3d at 614. The Sixth Circuit rejected the claim, concluding that a reservation-of-rights clause in an incorporated medical plan was "manifestly inconsistent with vesting" because "by definition, vested benefits may not be unilaterally terminated." *Id.* at 621. The Sixth Circuit chose to read the reservation-of-rights clause "consistently with the CBA," which, according to the

Sixth Circuit, meant that the employer "retains the right to terminate retiree healthcare benefits, but only after the expiration of the [CBA]." *Id.*

In *Crown Cork*, the Eighth Circuit reasoned that a plan's reservation-of-rights provision defeated a union's claim that a survivor benefits' clause, promising that benefits would continue until death, had vested benefits in a collective bargaining agreement. 501 F.3d at 918. And in *Grove*, the Third Circuit concluded that "'broad and unequivocal' reservation of rights clauses require us to resolve the vesting analysis in the company's favor," and therefore, even assuming that "phrases referring to an [a]ppellant's 'death' are durational in nature, the collective bargaining agreements' 'reservation of rights clauses overcome the promise of lifetime benefits.'" 694 F. App'x at 869 (alterations adopted) (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 903-04 & n.11 (3d Cir. 1995)).

The Fifth Circuit, however, has exercised greater caution, recognizing that "a reservation-of-rights clause in a plan document, which allows a company to amend or terminate a plan at any time, cannot vitiate contractually vested *or bargained-for rights.*" *Hunter v. Berkshire Hathaway, Inc.*, 829 F.3d 357, 363 (5th Cir. 2016) (internal quotation marks omitted). "To conclude otherwise would allow the company to take away bargained-for rights unilaterally." *Id.* The Fifth

36

Circuit's observation originated in a case like that here—a union argued that retiree benefits had vested under a CBA where there was "until death" language in an incorporated benefits agreement, while the employer relied on a plan document's reservation-of-rights clause to argue that the benefits were not vested. *Masonite*, 122 F.3d at 233. In *Masonite*, the Fifth Circuit reasoned that "[i]n the absence of the CBAs, the Plan's reservation-of-rights clause granting the company the right to amend or terminate the Plan might well end the inquiry in the company's favor. A reservation-of-rights clause in a plan document, however, cannot vitiate contractually vested or bargained-for rights." *Id.* The Fifth Circuit concluded that the "until death" language was ambiguous as to vesting, and consideration of extrinsic evidence of intent was necessary. *Id.* If the agreement had in fact "vested retiree benefits," then the reservation-of-rights clause could not "divest retired employees of those benefits." *Id.*

Like the Fifth Circuit, the Ninth Circuit has recognized the complexity of trying to square a reservation-of-rights clause, permitting unilateral modification and termination, with a bargained-for agreement. The Union points us to *Alday v. Raytheon*, 693 F.3d 772 (9th Cir. 2012), in which the Ninth Circuit concluded that a CBA had incorporated plans' reservation-of-rights provisions only with respect to

37

some, but not all, aspects of the benefit scheme. *Id.* at 795. Because the clauses referred only to the "Plan" and "Benefit Program," and not the CBAs, their scope was "limited to the Plans and incorporated Benefit Programs." *Id.* at 791. The Ninth Circuit concluded that "[t]he CBAs leave the designation of the precise medical benefits provided, and the procedures for obtaining them, to the Plans, and the Plans permit the Employer to modify the Plans accordingly." *Id.* at 791–92. But the Plan provisions did not affect, because they did "not purport to affect, the contribution obligations imposed by the CBAs." *Id.* at 791.

Xerox urges us to conclude that the 2018–21 CBA's incorporation of the plans' "detailed terms and conditions" included the "reservation of rights," and that the reservation "appl[ied] to the benefits 'outlined' in the CBA," such that it eliminates an interpretation that benefits vested. Appellee's Br. at 36. But Xerox fails to explain why we should equate the ability to modify or terminate "the Plan described herein" with the ability to modify or terminate benefits outlined, or incorporated as "terms and conditions," in the CBA. J. App'x at 120, 206, 238, 279. Moreover, accepting Xerox's preferred interpretation of the reservation-of-rights clause would suggest that, even during the term of the 2018–21 CBA, Xerox could have terminated bargained-for retiree benefits. The language does say "at any

38

time and for any reason." J. App'x at 206, 238, 279. This would suggest that the CBA's promise of retiree benefits was illusory, meaning Xerox's performance under the CBA was purely a function of whim. *See* 3 R. Lord, *Williston on Contracts* § 7:7 (4th ed. 2024) (describing illusory promises).

In general, courts "avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *Tackett*, 574 U.S. at 440. We share the Fifth Circuit's hesitancy to understand "a reservation-of-rights clause in a plan document, which allows a company to amend or terminate a plan at any time, [to] vitiate contractually vested *or bargained-for rights*." *Hunter*, 829 F.3d at 363 (internal quotation marks omitted).

To be sure, it may be possible to collectively bargain for a "privilege that could be unilaterally abrogated at the employer's discretion." *Alday*, 693 F.3d at 790 n.20; *see also Tackett*, 574 U.S. at 441 ("[A] promise that is 'partly' illusory is by definition not illusory."). For example, in *United Mine Workers v. Brushy Creek Coal Co.*, 505 F.3d 764 (7th Cir. 2007), the Seventh Circuit considered a CBA promising benefits "for life" and a plan's reservation-of-rights clause, and concluded that the union had bargained for "lifetime" retiree benefits that could be terminated by the employer at any time. *Id.* at 767. The Seventh Circuit explained that "[t]erminable

benefits for life are benefits that go on regardless of the age of the worker or how long ago he retired, but that cease if the plan conferring those benefits ends." *Id.*

But in *Brushy Creek*, the CBA had explicitly stated that "the specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans." *Id.* Here, the CBA does not contain a similarly "broad subordination clause." *See Alday*, 693 F.3d at 790 n.20 (noting that a CBA could provide for a "privilege that could be unilaterally abrogated at the employer's discretion," either "explicitly or through a broad subordination clause such as the one in *Brushy Creek*," but declining to "read such an authorization into a CBA when it does not appear there").

For its part, the Union suggests that it never agreed to the incorporation of the reservation-of-rights clause. But just as we are not convinced that we may simply conclude that the reservation-of-rights clause was incorporated wholesale to allow unilateral termination of retiree benefits at any time, we are not convinced that we may simply conclude that the reservation-of-rights clause was not incorporated at all. Perhaps one of these interpretations is correct, but overall, we are confronted with ambiguity. There are numerous reasonable ways to interpret the language and terms we have here, and it is unclear from the language alone

which of these interpretations the parties intended. *See Reese*, 583 U.S. at 139 (noting that a contract is ambiguous if "[it] remains reasonably susceptible to at least two reasonable but conflicting meanings").

Because the reservation-of-rights clause merely states that Xerox can modify or terminate "the Plan described herein," we could surmise, as did the Ninth Circuit when faced with similar language, that the clause could plausibly be interpreted to mean that Xerox may "modify the benefits plans *so long as* such modifications are reasonably commensurate with the benefits originally provided under the CBA." *Alday*, 693 F.3d at 788 n.18. Another possible interpretation is that suggested by the Sixth Circuit—that Xerox could modify or terminate the plans, but only after the CBA's expiration. *See Cooper*, 884 F.3d at 621. And yet another possible interpretation is that suggested by the Fifth Circuit and our reasoning in *Abbruscato*—that Xerox could modify or terminate the plans at any time, but not benefits that had already accrued or vested. *See Hunter*, 829 F.3d at 363; *Masonite*, 122 F.3d at 233; *Abbruscato*, 274 F.3d at 98. In this scenario, the clause could be interpreted to mean that Xerox "merely reserved the right to change" the Plan "for those individuals who ha[d] not already retired under the terms described, not the right to alter the described benefits," either in the text of the

CBA itself or as incorporated, "for those individuals who had retired under those terms." *Abbruscato*, 274 F.3d at 98.

A more specific CBA or reservation-of-rights clause could have clarified the parties' intent. But here, how a court would know, without consulting extrinsic evidence, that the parties intended one of these reasonable interpretations and not another is unclear to us. *See Tackett*, 574 U.S. at 438–39 (cautioning against assessments "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention").

In sum, we cannot read this CBA and say with certainty whether or not the parties intended vested retiree benefits. We conclude, however, that the Union has identified language capable of being reasonably interpreted to promise vested benefits that extend beyond the CBA's duration, or that constitute deferred compensation, and we are not persuaded that the broad reservation-of-rights clause in the plan Restatements resolves the ambiguity. To discern the parties' intent here, consulting extrinsic evidence of intent may be necessary. If the Union's grievance is indeed arbitrable, this would be a task for the arbitrator.[8]

---

[8] Because we conclude that the Union identified language capable of being reasonably interpreted to have vested retiree benefits, we vacate the district court's judgment. We

## CONCLUSION

For the reasons set forth above, we **VACATE** the district court's judgment

and **REMAND** for further proceedings.

---

therefore need not and do not reach the Union's additional argument that the district court's entry of declaratory judgment was procedurally improper. As previously noted, we also decline to reach Xerox's alternative argument that the CBA's grievance procedure cannot be invoked by retirees. *See supra* at 15 n.4. On remand, the district court may consider this and any other remaining issues in the first instance.